**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SHANNON TAYLOR, individually and on behalf of all others similarly situated, | |
| Plaintiff, | Civil Action No. 16-cv-01812-KMK |
| v. | |
| TRUSTED MEDIA BRANDS, INC., | |
| Defendant. | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR
ATTORNEYS' FEES, EXPENSES, AND INCENTIVE AWARD**

Dated: December 5, 2017

**BURSOR & FISHER, P.A.**

Scott A. Bursor
Joseph I. Marchese
Philip L. Fraietta
888 Seventh Avenue
New York, NY  10019
Telephone:  (646) 837-7150
Facsimile:  (212) 989-9163
Email:  scott@bursor.com
        jmarchese@bursor.com
        pfraietta@bursor.com

*Class Counsel*

# TABLE OF CONTENTS

PAGE(S)

INTRODUCTION ............................................................................................................ 1

FACTUAL AND PROCEDURAL BACKGROUND .................................................... 2

    A.    Michigan's Preservation Of Personal Privacy Act ................................ 2

    B.    Plaintiff's Allegations ............................................................................ 2

    C.    The Litigation And Work Performed To Benefit The Class .................. 3

SUMMARY OF THE SETTLEMENT ......................................................................... 5

ARGUMENT .................................................................................................................. 5

I.    THE REQUESTED ATTORNEYS' FEES ARE REASONABLE AND SHOULD BE APPROVED ....................................................................... 5

    A.    The Percentage Method Should Be Used To Calculate Fees ................. 8

    B.    The Reasonableness Of The Requested Fees Is Supported By This Circuit's Goldberger Six-Factor Test ................................................... 9

        1.    Time And Labor Expended By Counsel ..................................... 10

        2.    Magnitude And Complexity Of The Litigation ......................... 11

        3.    The Risk Of Litigation ............................................................... 12

        4.    The Quality Of Representation ................................................... 13

        5.    The Requested Fee In Relation To The Settlement .................... 14

        6.    Public Policy Considerations ...................................................... 15

    C.    The Requested Attorneys' Fees Are Also Reasonable Under A Lodestar Cross-Check ........................................................................... 16

II.    THE REQUESTED INCENTIVE AWARD REFLECTS MS. TAYLOR'S ACTIVE INVOLVEMENT IN THIS ACTION AND SHOULD BE APPROVED .............................................................................. 19

CONCLUSION ............................................................................................................. 20

## TABLE OF AUTHORITIES

**PAGE(S)**

## CASES

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*,
  522 F.3d 182 (2d Cir. 2008) ............................................................................................7, 8

*Baffa v. Donaldson Lufkin & Jenrette Secs. Corp.*,
  2002 WL 1315603 (S.D.N.Y. June 17, 2002) ........................................................................7

*Beacon Assocs. Litig.*,
  2013 WL 2450960 (S.D.N.Y. May 9, 2013) ........................................................................6, 8

*Beckman v. KeyBank, N.A.*,
  293 F.R.D. 467 (S.D.N.Y. 2013) .....................................................................................18, 19

*Blum v. Stenson*,
  465 U.S. 886 (1984) .................................................................................................................16

*Cain v. Redbox Automated Retail, LLC*,
  136 F. Supp. 3d 824 (E.D. Mich. 2015) ..........................................................................13, 14

*Cassese v. Williams*,
  503 F. App'x 55 (2d Cir. 2012) ..............................................................................................16

*Castagna v. Madison Square Garden, L.P.*,
  2011 WL 2208614 (S.D.N.Y. June 7, 2011) ..........................................................................19

*City of Providence v. Aeropostale, Inc.*,
  2014 WL 1883494 (S.D.N.Y. May 9, 2014) ............................................................................7

*Clark v. Ecolab, Inc.*,
  2010 WL 1948198 (S.D.N.Y. May 11, 2010) ..........................................................................8

*Dornberger v. Metro. Life Ins. Co.*,
  203 F.R.D. 118 (S.D.N.Y. 2001) ............................................................................................20

*Ebin v. Kangadis Food Inc.*,
  297 F.R.D. 561 (S.D.N.Y. Feb. 25, 2014) ..............................................................................14

*Eisen v. Carlisle & Jacquelin*,
  417 U.S. 156 (1974) .................................................................................................................15

*GB ex rel NB v. Tuxedo Union Free School Dist.*,
  894 F. Supp. 2d 415 (S.D.N.Y. 2012) ......................................................................................7

*Goldberger v. Integrated Resources, Inc.*,
  209 F.3d 43 (2d Cir. 2000) ...............................................................................................passim

*Hayes v. Harmony Gold Min. Co.*,
  2011 WL 6019219 (S.D.N.Y. Dec. 2, 2011) ............................................................................7

*Hernandez v. Merrill Lynch & Co.*,
   2012 WL 5862749 (S.D.N.Y. Nov. 15, 2012) ....................................................................19

*Hyun v. Ippudo USA Holdings*,
   2016 WL 1222347 (S.D.N.Y. Mar. 24, 2016) ...............................................................9, 18

*In re Avon Prods., Inc. Sec. Litig.*,
   1992 WL 349768 (S.D.N.Y. Nov. 6, 1992)..........................................................................6

*In re Citigroup Inc. Sec. Litig.*,
   965 F. Supp. 2d 369 (S.D.N.Y. 2013) ..................................................................................6

*In re Currency Conversion Fee Antitrust Litig.*,
   263 F.R.D. 110 (S.D.N.Y. Oct. 22, 2009) .........................................................................20

*In re EVCI Career Colleges Holding Corp. Sec. Litig.*,
   2007 WL 2230177 (S.D.N.Y. July 27, 2007) .......................................................................8

*In re Initial Public Offering Secs. Litig.*,
   671 F. Supp. 2d 467 (S.D.N.Y.2009) ...................................................................................7

*In re Marsh ERISA Litig.*,
   265 F.R.D. 128 (S.D.N.Y. 2010) ................................................................................12, 14

*In re Merry-Go-Round Enters., Inc.*,
   244 B.R. 327, 335 (Bankr. D.Md. 2000) ...........................................................................18

*In re MetLife Demutalization Litig.*,
   689 F. Supp. 2d 297 (E.D.N.Y. 2010) ...............................................................................14

*In re Nasdaq Market-Makers Antitrust Litig.*,
   187 F.R.D. 465 (S.D.N.Y. 1998) .......................................................................................11

*In re Telik, Inc. Sec. Litig.*,
   576 F. Supp. 2d 570 (S.D.N.Y. 2008) ...............................................................................12

*Khait v. Whirlpool Corp.*,
   2010 WL 2025106 (E.D.N.Y. Jan. 20, 2010) ......................................................................7

*LeBlanc-Sternberg v. Fletcher*,
   143 F. 3d 748 (2d Cir. 1998) ......................................................................................17, 18

*Luciano v. Olsten Corp.*,
   109 F.3d 111 (2d Cir. 1997) ..............................................................................................16

*Massiah v. MetroPlus Health Plan, Inc.*,
   2012 WL 5874655 (E.D.N.Y. Nov. 20, 2012).............................................................15, 19

*McDaniel v. County of Schenectady*,
   595 F.3d 411 (2d Cir. 2010) .......................................................................................6, 9, 18

*McMahon v. Olivier Cheng Catering & Events, LLC*,
   2010 WL 2399328 (S.D.N.Y. Mar. 3, 2010) .....................................................................19

iii

*Missouri v. Jenkins*,
491 U.S. 274 (1989) ..................................................................................17

*Parker v. Jekyll & Hyde Entm't Holdings, LLC*,
2010 WL 532960 (S.D.N.Y. Feb. 9, 2010) .............................................18

*Parker v. Time Warner Entertainment Co., L.P.*,
631 F. Supp. 2d 242 (E.D.N.Y. 2009) ....................................................16

*Pennsylvania v. Del. Valley Citizens' Council for Clean Air*,
478 U.S. 546 (1986) ................................................................................16

*Perdue v. Kenny A. ex rel. Winn*,
559 U.S. 542 (2010) ..................................................................................8

*Reyes v. Altamarea Grp.*,
2011 WL 4599822 (S.D.N.Y. Aug. 16, 2011) ....................................8, 19

*Shapiro v. JPMorgan Chase 7 Co.*,
2014 WL 1224666 (S.D.N.Y. Mar. 24, 2014) ...........................12, 15, 16

*Varljen v. H.J. Meyers & Co., Inc.*,
2000 WL 1683656 (S.D.N.Y. Nov. 8, 2000) .............................................8

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
396 F.3d 96 (2d Cir. 2005) ............................................................6, 7, 9, 16

*Wilkins v. HSBC Bank Nevada, N.A.*,
2015 WL 890566 (N.D. Ill. Feb. 27, 2015) .............................................18

*Willix v. Healthfirst, Inc.*,
2011 WL 754862 (E.D.N.Y. Feb. 18, 2011) ..............................................7

*Yuzary v. HSBC Bank USA, N.A.*,
2013 WL 5492998 (S.D.N.Y. Oct. 2, 2013) .........................................6, 18

**STATUTES**

M.C.L. §445.1711 ..........................................................................................1

M.C.L. § 445.1712 ......................................................................................1, 2

M.C.L. § 445.1713 ..........................................................................................1

M.C.L. § 445.1714 ..........................................................................................1

M.C.L. § 445.1715 ......................................................................................1, 2

**RULES**

Fed. R. Civ. P. 16 ...........................................................................................4

Fed. R. Civ. P. 23(e) .......................................................................................1

Fed. R. Civ. P. 23(h) ........................................................................................5, 6

Fed. R. Civ. P. 26 .............................................................................................4

Fed. R. Civ. P. 26(a)(1) ...................................................................................4

## INTRODUCTION

The class action settlement between Plaintiff Shannon Taylor and Defendant Trusted Media Brands, Inc. ("TMBI"), which, if finally approved, resolves Plaintiff's and the Class' claims against TMBI under Michigan's Preservation of Personal Privacy Act ("PPPA"), M.C.L. §§ 445.1711-1715, is the fifth and largest yet to be reached. The settlement – preliminarily approved by this Court on October 17, 2017 – creates an $8.225 million non-reversionary common fund from which class members will receive *pro rata* cash payments estimated to be around $50. Measured by total dollars, this settlement is the largest ever reached in a PPPA case.

While resolution was achieved in a relatively short period of time, obtaining the exceptional relief did not come easily. Rather, Plaintiff shouldered significant risk and battled through more than a year of hard-fought litigation, involving complex factual investigation into TMBI's disclosure practices, case-dispositive motion practice on novel legal issues, and discovery. When the Parties thought that there was a potential for resolution, they sought the assistance of a well-respected former federal magistrate judge now at JAMS. And, while they ultimately achieved a settlement, it was only after weeks of continued negotiations through the mediator.

In light of this exceptional result, Plaintiff respectfully requests pursuant to Federal Rule of Civil Procedure 23(e) that the Court approve attorneys' fees and expenses of one-third (33.33%) of the settlement fund, or $2,741,392.50, as well as an incentive award of $5,000 for Plaintiff for her service as class representative. Even though this settlement is larger, the requested fee is a lesser percentage than the 35% that was approved in *Kinder v. Meredith Corp.*, No. 13-cv-11284, ECF No. 81 (E.D. Mich. 2016) (awarding 35% of $7.5 million settlement fund) and in *Moeller v. American Media, Inc.*, No. 16-cv-11367, ECF No. 42 (E.D. Mich. 2017) (awarding 35% of $7.6 million settlement fund).

For these reasons, and as explained further below, this Court should approve the requested fee and incentive award.

## FACTUAL AND PROCEDURAL BACKGROUND

A brief summary of the PPPA, the litigation performed by Class Counsel for the Settlement Class' benefit, and the beneficial terms of the Settlement provide necessary context to the reasonableness of the requested fees and incentive award.

### A.   Michigan's Preservation Of Personal Privacy Act

The Michigan legislature passed the PPPA "to preserve personal privacy with respect to the purchase, rental, or borrowing of written materials, sound recordings, and video recordings." M.C.L. § 445.1712.  As such, the PPPA provides that:

> a person, or an employee or agent of the person, engaged in the business of selling at retail . . . books or other written materials . . . shall not disclose to any person, other than the customer, a record or information concerning the purchase . . . of those materials by a customer that indicates the identity of the customer.

M.C.L. § 445.1712.

To enforce the statute, the PPPA authorizes civil actions and provides for the recovery of statutory damages in the amount of $5,000, plus costs and reasonable attorney fees.  *See* M.C.L. § 445.1715.

### B.   Plaintiff's Allegations

TMBI is an international media company that, directly and through its subsidiaries, publishes some of the most widely circulated magazines in the United States.  *See* Plaintiff's Class Action Complaint, ECF. No. 1 ["Compl."], ¶ 1 n.1.  Plaintiff alleges that TMBI sells information related to its customers' magazine subscription histories and personal reading habits. *Id.* ¶¶ 1-5, 8, 43-49.  To increase the value of such information, Plaintiff alleges that TMBI trades its customers' protected reading information with certain third parties – including data mining companies – in exchange for other demographic and lifestyle data that such companies

have already gathered (or "mined") on each subscriber.  *Id.* ¶¶ 8, 43.  Plaintiff further alleges that

TMBI thereafter "enhances" its own customer profiles with this additional data (e.g., income

levels, religion, age, race, political affiliation, travel habits, medical conditions, etc.), and then

sells the enhanced information to other unrelated third parties for a profit.  *Id.* ¶¶ 8-9, 44-45.

 Plaintiff further alleges that no matter how consumers subscribe (i.e., via postcard, over

the phone, on TMBI's websites, or through a subscription agent's website), TMBI's customers

never provide consent to disclose information related to their magazine subscriptions to third

parties.  *Id.* ¶¶ 10, 46-47, 49.  This is because – during the subscription process – Plaintiff claims

that customers are not required to consent to any terms or policies informing them of TMBI's

disclosure practices.  *Id.*  Likewise, even after subscribing, Plaintiff alleges that TMBI fails to

notify customers that it will disclose their protected reading information to third parties.  *Id.*

Nonetheless, TMBI is in the business of disclosing all of their customers' protected reading

information to various third parties, without any consent.  *Id.* ¶¶ 8-10, 46-47, 49.

  **C. The Litigation And Work Performed To Benefit The Class**

 In June 2015, Class Counsel began what would be a seven-month pre-suit investigation

into TMBI's alleged data-sharing practices.  *See* Declaration of Joseph I. Marchese ("Marchese

Decl.") ¶ 3.  While that investigation was on-going, the Michigan State Senate passed a bill to

amend the PPPA and *Spokeo v. Robins* – a case regarding Article III standing in statutory cases –

was then pending before the Supreme Court.  *Id.* ¶¶ 4-5.  Knowing both of these events would

impact the litigation, Plaintiff filed her class action lawsuit on March 10, 2016, ECF No. 1, and

TBMI has vigorously defended itself from the outset, seizing on both issues.  *Id.* ¶¶ 6, 9.  On

April 12, 2016, the Michigan House of Representatives passed the bill to amend the PPPA, and

on May 16, 2016, the Supreme Court issued its opinion in *Spokeo*.  *Id.* ¶¶ 7, 10.  On July 15,

2016, after the Parties appeared before the Court for a premotion conference on TMBI's motion

to dismiss, TMBI served its motion to dismiss arguing that: (1) Plaintiff lacked Article III standing because she failed to allege an injury-in-fact; (2) the PPPA, as amended, removed the statutory damage's provision, and that amendment applies retroactively; (3) Defendant's alleged disclosures are permitted by the PPPA's direct marketing defense; and (4) the PPPA is overboard and void under the First Amendment. *Id.* ¶ 14. These legal arguments were novel, and had previously only been addressed in *Boelter v. Hearst Communications, Inc.*, No. 15-cv-03934-AT (S.D.N.Y.) and *Boelter v. Advance Magazine Publishers. Inc. d/b/a Condé Nast*, No. 15-cv-05671-NRB (S.D.N.Y.), two similar cases under the PPPA in which Class Counsel serves as Plaintiff's counsel. *Id.* ¶ 9. Plaintiff opposed TMBI's motion on August 10, 2016, and Class Counsel was able to incorporate its winning work product from *Hearst* and *Condé Nast* in doing so. *Id.* ¶ 15.

On October 20, 2016, the Court held an initial scheduling conference pursuant to Fed. R. Civ. P. 16 and thereafter entered a Scheduling Order. *Id.* ¶ 18. The Parties then exchanged their initial disclosures pursuant to Fed. R. Civ. P. 26(a)(1), conducted substantial written and document discovery on the merits of the case, and produced and reviewed thousands of pages of documents, and engaged in several meet and confer conferences, all while TMBI's motion to dismiss remained pending. *Id.* ¶¶ 19-25.

From the outset of the case, and including during the pendency of the motion to dismiss, the Parties engaged in direct communications, and as part of their obligations under Fed. R. Civ. P. 26, discussed the prospect of early resolution. *Id.* ¶ 26. On February 2, 2017, Plaintiff served a 12-page single-spaced settlement letter detailing the strengths of Plaintiff's claims and outlining a framework for class-wide settlement on defense counsel. *Id.* ¶ 28. The letter sparked discussions between the Parties that eventually led to an agreement between the Parties to engage in early mediation, which the Parties agreed would take place before former U.S. Magistrate

4

Judge Frank Maas (of the District Court for the Southern District of New York), who is a neutral affiliated with JAMS New York. *Id.* ¶ 29. On March 14, 2017, the Parties notified the Court by joint letter that they intended to mediate before Judge Maas. *See* ECF No. 66. As a result, on March 16, 2017, the Court stayed all discovery deadlines and denied TMBI's motion to dismiss without prejudice pending resolution of the mediation, after which TMBI was given leave to re-file. *See* ECF No. 67.

The mediation took place on April 3, 2017 at JAM's offices in New York and lasted approximately six hours. Marchese Decl. ¶ 31. While the Parties engaged in good faith negotiations, which at all times were at arms' length, they failed to reach an agreement that day. *Id.* Following the mediation session, the Parties worked further with Judge Maas and were able to reach an agreement with his help. *Id.* ¶ 32.

## SUMMARY OF THE SETTLEMENT

Class Counsel's efforts resulted in the largest settlement, measured by total dollars, ever achieved under the PPPA. *Id.* ¶ 33. The Settlement provides an exceptional result for the class by delivering immediate cash to approximately 1,104,383 magazine subscribers in Michigan. *Id.* The Settlement creates a non-reversionary $8,225,000 Settlement Fund, from which class members will receive a *pro rata* cash payment, which Class Counsel estimates will be approximately $50. Marchese Decl. Ex. A, Class Action Settlement Agreement ("Agreement") ¶¶ 1.32, 2.1; *see also* Marchese Decl. ¶ 33.

## ARGUMENT

## I.   THE REQUESTED ATTORNEYS' FEES ARE REASONABLE AND SHOULD BE APPROVED

The requested fee award of $2,741,392.50, representing one-third (33.33%) of the common fund, is reasonable and merits approval. Under Federal Rule of Civil Procedure 23(h), courts may award "reasonable attorney's fees and nontaxable costs that are authorized by law or

the parties' agreement." Fed. R. Civ. P. 23(h).[1]  Here, the Settlement Agreement between the

Parties provides that Class Counsel may petition the Court for an award up to one-third of the

Settlement Fund.  Agreement ¶ 8.1.

In common-fund cases such as this one, courts in the Second Circuit apply one of two fee

calculation methods – the "percentage of the fund" method or the "lodestar" method.  *See*

*Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 50 (2d Cir. 2000).  The Court has

discretion in choosing which method to employ.  *See McDaniel v. County of Schenectady*, 595

F.3d 411, 419 (2d Cir. 2010) (holding that "the decision as to the appropriate method [is left] to

'the district court, which is intimately familiar with the nuances of the case'") (quoting

*Goldberger*, 209 F.3d at 48).  "[T]he trend in this Circuit has been toward the use of a percentage

of recovery as the preferred method of calculating the award for class counsel in common fund

cases." *In re Beacon Assocs. Litig.*, 2013 WL 2450960, at *5 (S.D.N.Y. May 9, 2013); *see also,*

*e.g., In re Avon Prods., Inc. Sec. Litig.*, 1992 WL 349768 (S.D.N.Y. Nov. 6, 1992).  In fact, the

"trend" of using the percentage of the fund method to compensate class counsel is now "firmly

entrenched in the jurisprudence of this Circuit."  *In re Citigroup Inc. Sec. Litig.*, 965 F. Supp. 2d

369, 388 (S.D.N.Y. 2013).  As the Second Circuit has stated, the percentage method "directly

aligns the interests of the class and its counsel and provides a powerful incentive for the efficient

prosecution and early resolution of litigation."  *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396

F.3d 96, 121 (2d Cir. 2005).  "In contrast, the 'lodestar create[s] an unanticipated disincentive to

---

[1] The requested fee award also encompasses unreimbursed litigation expenses.  Agreement ¶ 8.1. Reasonable litigation-related expenses are customarily awarded in common fund cases and include costs such as document preparation and travel.  *See, e.g.*, *Yuzary v. HSBC Bank USA, N.A.*, 2013 WL 5492998, at *11 (S.D.N.Y. Oct. 2, 2013) ("Class Counsel's unreimbursed expenses, including court and process server fees, postage and courier fees, transportation, working meals, photocopies, electronic research, expert fees, and Plaintiffs' share of the mediator's fees, are reasonable and were incidental and necessary to the representation of the class.").  Thus, included in the requested fee award, Class Counsel respectfully seeks reimbursement of $6,675.53 for out-of-pocket expenses in these standard categories.  *See* Marchese Decl. ¶ 46, Ex. C.

early settlements, tempt[s] lawyers to run up their hours, and compel[s] district courts to engage in gimlet-eyed review of line-item fee audits.'" *Id.* (quoting *Baffa v. Donaldson Lufkin & Jenrette Secs. Corp.*, 2002 WL 1315603, at *1 (S.D.N.Y. June 17, 2002)).  Indeed, over a decade ago, the Second Circuit described difficulties with the lodestar method:

> As so often happens with simple nostrums, experience with the lodestar method proved vexing.  Our district courts found it created a temptation for lawyers to run up the number of hours for which they could be paid.  For the same reason, the lodestar created an unanticipated disincentive to early settlements.  But the primary source of dissatisfaction was that it resurrected the ghost of Ebenezer Scrooge, compelling district courts to engage in a gimlet-eyed review of line-item fee audits.  There was an inevitable waste of judicial resources.

*Goldberger*, 209 F.3d at 48-49.  This Court has also been critical of the lodestar method, and has noted that "courts in the Second Circuit no longer use the 'lodestar' method for computing attorneys' fees" in fee-shifting cases.  *GB ex rel NB v. Tuxedo Union Free School Dist.*, 894 F. Supp. 2d 415, 427 (S.D.N.Y. 2012) (citing *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 522 F.3d 182 (2d Cir. 2008)).

Moreover, Courts in this Circuit routinely approve fee requests for one-third of a common fund.  *See Hayes v. Harmony Gold Min. Co.*, 2011 WL 6019219, at *1 (S.D.N.Y. Dec. 2, 2011) (awarding "attorneys' fees in the amount of one third" of a $9 million settlement fund), *aff'd* 509 F. App'x 21, 23-24 (2d Cir. 2013) (affirming fee award, and noting that "the prospect of a percentage fee award from a common fund settlement, as here, aligns the interests of class counsel with those of the class"); *In re Initial Public Offering Secs. Litig.*, 671 F. Supp. 2d 467, 516 (S.D.N.Y.2009) (awarding one-third of the $510 million net settlement fund); *City of Providence v. Aeropostale, Inc.*, 2014 WL 1883494, at *20 (S.D.N.Y. May 9, 2014) (awarding 33% of $15 million settlement fund); *Khait v. Whirlpool Corp.*, 2010 WL 2025106, at *8 (E.D.N.Y. Jan. 20, 2010) (awarding 33% of $9.25 million settlement fund); *Willix v. Healthfirst,*

*Inc.*, 2011 WL 754862, at *6–7 (E.D.N.Y. Feb. 18, 2011) (awarding one-third of $7.675 million

settlement fund); *Clark v. Ecolab, Inc.*, 2010 WL 1948198, at *8–9 (S.D.N.Y. May 11, 2010)

(awarding one-third of $6 million settlement fund).  Indeed, as courts in this Circuit have noted,

fee requests for one-third of common funds represent what "reasonable, paying client[s] …

typically pay … of their recoveries under private retainer agreements."  *Reyes v. Altamarea Grp.*,

2011 WL 4599822, at *8 (S.D.N.Y. Aug. 16, 2011) (citing *Arbor Hill*, 522 F.3d 182).

### A.    The Percentage Method Should Be Used To Calculate Fees

As aforementioned, the "trend in this Circuit has been toward the use of a percentage of

recovery as the preferred method of calculating the award for class counsel in common fund

cases."  *In re Beacon Assocs. Litig.*, 2013 WL 2450960, at *5 (S.D.N.Y. May 9, 2013).  Indeed,

the percentage method has been used to calculate fees for the four other major PPPA class action

settlements.  *See Halaburda v. Bauer Publ'g Co., L.P.*, No. 12-cv-12831, ECF No. 68 (E.D.

Mich. 2015); *Kinder v. Meredith Corp.*, No. 13-cv-11284, ECF No. 81 (E.D. Mich. 2016);

*Coulter-Owens v. Rodale, Inc.*, No. 14-cv-12688, ECF No. 54 (E.D. Mich. 2016); *Moeller v.

American Media, Inc.*, No. 16-cv-11367, ECF No. 42 (E.D. Mich. 2017).  In contrast, the

lodestar approach is more often applied in federal fee-shifting cases, particularly civil rights

actions.  *See, e.g.*, *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 551 (2010).  As Judge Cote

has stated, the percentage method is preferred for several reasons:

> First, it relieves the court of the cumbersome, enervating, and often
> surrealistic process of evaluating fee petitions.  Second, it
> decreases plaintiff lawyers' incentive to run up the number of
> billable hours for which they would be compensated by the
> lodestar method.  And finally, it decreases the incentive to delay
> settlement because the fee for the plaintiffs' attorneys does not
> increase with delay.

*Varljen v. H.J. Meyers & Co., Inc.*, 2000 WL 1683656, at *5 (S.D.N.Y. Nov. 8, 2000) (internal

citations omitted); *see also In re EVCI Career Colleges Holding Corp. Sec. Litig.*, 2007 WL

2230177, at *16 (S.D.N.Y. July 27, 2007) ("From a public policy perspective, the percentage method is the most efficient means of compensating the work of class action attorneys. It does not waste judicial resources analyzing thousands of hours of work, where counsel obtained a superior result.").

Under the circumstances of this case – wherein Class Counsel received an exceptional result for the Settlement Class early in the litigation – the Second Circuit prefers the percentage method. *See Wal-Mart Stores, Inc.*, 396 F.3d at 121 (noting that the percentage method "directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation"); *Hyun v. Ippudo USA Holdings*, 2016 WL 1222347, at *3 (S.D.N.Y. Mar. 24, 2016) ("In this case, where the parties were able to settle relatively early and before any depositions occurred … the Court finds that the percentage method, which avoids the lodestar method's potential to 'create a disincentive to early settlement' … is appropriate.") (citing *McDaniel*, 595 F.3d at 418). In contrast, "the lodestar create[s] an unanticipated disincentive to early settlements, tempt[s] lawyers to run up their hours, and compel[s] district courts to engage in gimlet-eyed review of line-item fee audits." *Wal-Mart Stores, Inc.*, 396 F.3d at 121 (quotation omitted).

## B. The Reasonableness Of The Requested Fees Is Supported By This Circuit's Goldberger Six-Factor Test

The Second Circuit has articulated six factors that should be considered when determining the reasonableness of a requested percentage to award as attorneys' fees: "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation…; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations." *Goldberger*, 209 F.3d at 50. A review of these factors support Class Counsel's fee request.

### 1.  Time And Labor Expended By Counsel

Class Counsel has been working on this case since June 2015, when it began investigating magazine publishers' violations of the PPPA.  *See* Marchese Decl. ¶ 3.  The pre-suit investigation was extensive, spanning more than seven months, and involving in-depth research into a number of data industry practices, including data appending and data cooperatives.  *Id.* ¶ 3.  During that pre-suit investigation, Class Counsel also conducted extensive research into the Supreme Court's Article III standing precedents, in light of the Supreme Court granting *certiorari* in *Spokeo v. Robins*, and also conducted extensive research into the retroactive application of statutory amendments under Michigan law, in light of the Michigan State Senate having passed a bill to amend the PPPA.  *Id.* ¶¶ 4-5.  Class Counsel also drafted the complaint, engaged in dispositive motion practice on novel legal issues, served and responded to discovery requests, conducted meet-and-confer teleconferences with defense counsel, and reviewed thousands of pages of documents.  *Id.* ¶¶ 6-25.  Thereafter, Class Counsel thoroughly analyzed Defendant's applicable insurance policy and considered it in crafting a litigation and settlement strategy going forward.  *Id.* ¶ 27.  To that end, on February 3, 2017, served a 12-page single-spaced settlement letter detailing the strengths of Plaintiff's case and outlining a framework for class-wide settlement on Defendant's counsel.  *Id.* ¶ 28.  In addition, Class Counsel prepared a detailed mediation statement outlining the strength of Plaintiff's case, and comparing the case with other PPPA cases against magazine publishers that had settled, participated in a six-hour mediation with Judge Maas, and continued to work with Judge Maas over the next few weeks to ultimately reach the instant Settlement – which is the largest ever by total dollars in a PPPA case.  *Id.* ¶¶ 26-33.

Thus, the work performed by Class Counsel to date has been comprehensive, complex, and wide ranging.  This factor supports the requested fee award.

2.      **Magnitude And Complexity Of The Litigation**

"[C]lass actions have a well deserved reputation as being most complex." *In re Nasdaq Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 477 (S.D.N.Y. 1998) (internal citation and quotations omitted). This case was no exception, both factually and legally. This case involved multiple layers of factual complexity, much of which was obscured at the outset due to TMBI's alleged concealment of its data sharing practices from consumers. As a result, this required extensive preliminary investigation into TMBI's business practices, their methods of data collection and aggregation, and the nature of their relationships with various third-party data companies. Marchese Decl. ¶¶ 3, 19, 23.

The case involved complex legal issues as well. TMBI challenged the basis of the lawsuit on constitutional grounds, based on new case law that did not even exist at the time of filing. *Id.* ¶ 14. TMBI also challenged the basis of the lawsuit on statutory grounds, as the PPPA was amended after the case was filed. *Id.* And TMBI challenged the lawsuit by arguing that: (1) TMBI's alleged disclosures were permitted by the PPPA's direct marketing defense; and (2) the PPPA is overbroad and void under the First Amendment. *Id.* If that motion would have been ultimately denied, Plaintiff was keenly aware that TMBI would continue to challenge liability and the constitutionality of the PPPA, as well as assert a number of defenses. TMBI indicated that it would continue to assert numerous defenses on the merits, including that the PPPA neither prohibits the disclosure of the magazine information at issue, nor applies to TMBI at all. TMBI would have also continued to challenge Plaintiff's standing, as well as the constitutionality of the PPPA, and its applicability to magazines in particular and the magazine publishing industry in general. *Id.* ¶ 39.

In the end, because this case involved complex factual and legal questions under the PPPA – its application to magazines and magazine publishing, the constitutionality of the

underlying statute, and defining the scope of what it means to sell a magazine "at retail," an issue which was recently decided unfavorably for Plaintiff by the Sixth Circuit – the magnitude and complexity of the litigation further supports the requested fee award.

### 3. The Risk Of Litigation

This factor recognizes the risk of non-payment in cases prosecuted on a contingency basis where claims are not successful, which can justify higher fees. *See, e.g., In re Marsh ERISA Litig.*, 265 F.R.D. 128, 148 (S.D.N.Y. 2010) ("There was significant risk of non-payment in this case, and Plaintiffs' Counsel should be rewarded for having borne and successfully overcome that risk."); *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 592 (S.D.N.Y. 2008) (noting risk of non-payment in cases brought on contingency basis). "It is well settled that class actions are notoriously complex and difficult to litigate." *Shapiro v. JPMorgan Chase 7 Co.*, 2014 WL 1224666, at *21 (S.D.N.Y. Mar. 24, 2014) (internal citation omitted). This case presented a substantial risk of non-payment for Class Counsel.

For over a year, Class Counsel invested significant time, effort, and resources to the litigation without any compensation. Marchese Decl. ¶ 3. Cognizant of the risk of nonpayment, Class Counsel nonetheless embarked on a fact-intensive investigation of TMBI's practices, engaged in dispositive motion practice, and exchanged written discovery. *Id.* ¶¶ 3, 8-25. Class Counsel also filed this case with *Spokeo* pending, and with the Michigan State Senate having just passed a bill to amend the PPPA, either of which could have been dispositive on the case. *Id.* ¶¶ 4-5. Additionally, Class Counsel also paid for and participated in not only a six-hour private mediation, but weeks of additional discussions with the mediator in order to try and resolve the action. *Id.* ¶¶ 31-32. Class Counsel fronted this investment of time and resources, despite the significant risk of nonpayment inherent in this case. *Id.* ¶¶ 3, 8-25. And given the defenses mounted by TMBI, as well as the fairly limited history of PPPA litigation, success on the legal

issues presented by this case was far from certain.  *Id.* ¶¶ 3, 4-16, 39.  Moreover, Class Counsel

faced highly qualified defense counsel, who themselves represent leading magazine publishers in

related PPPA litigation.  *See Condé Nast*, No. 15-cv-05671-NRB.  Defense counsel has been

successful in defeating other PPPA cases, further underscoring the risks Class Counsel faced in

pursuing this litigation.  *See Cain v. Redbox Automated Retail, LLC*, 136 F. Supp. 3d 824 (E.D.

Mich. 2015) (granting summary judgment for defendant on a PPPA claim).

Furthermore, Class Counsel took this case despite knowing that TMBI had undergone

two bankruptcy proceedings in the past ten years.  *See In re Reader's Digest Media Group, Inc.*,

No. 13-bk-22253 (Bankr. S.D.N.Y. 2013); *In re Reader's Digest Media Group, Inc.*, No. 09-bk-

23563 (Bankr. S.D.N.Y. 2009).  Thus, there is significant and reasonable doubt that TMBI would

be unable to withstand a greater judgment.

The fact that Class Counsel undertook this representation, despite the significant risk of

nonpayment, supports the requested fee award.

### 4.     The Quality Of Representation

Class action litigation presents unique challenges and – by achieving the largest total

dollar settlement ever in a PPPA case – Class Counsel proved that they have the ability and

resources to litigate this case zealously and effectively.  In addition, Class Counsel are well-

respected attorneys with significant experience litigating consumer class actions of similar size,

scope, and complexity.  Marchese Decl. ¶ 53, Ex. L.  Class Counsel also served as Class Counsel

in *Moeller v. American Media, Inc.*, No. 16-cv-11368, a case brought under the PPPA wherein

the Court approved a class-wide settlement for $7.6 million.  *Id.*  Class Counsel is also counsel

for plaintiffs in three other PPPA putative class actions pending in this District.  *See Hearst*, No.

15-cv-09279-AT; *Condé Nast*, No. 15-cv-05671-NRB; *Ruppel v. Consumers Union of United

States, Inc.*, No. 16-cv-02444-KMK.  *Id.*  Each of these actions survived motions to dismiss, and

Judge Torres recently granted Plaintiff's motion for partial summary judgment in *Hearst*. *Id.*
Moreover, Class Counsel has been recognized by courts across the country for its expertise. *See*
Firm Resume, Marchese Decl. Ex. L; *see also Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 566
(S.D.N.Y. Feb. 25, 2014) (Rakoff, J.) ("Bursor & Fisher, P.A., are class action lawyers who have
experience litigating consumer claims. … The firm has been appointed class counsel in dozens
of cases in both federal and state courts, and has won multi-million dollar verdicts or recoveries
in five class action jury trials since 2008."); *In re Michaels Stores Pin Pad Litigation*, No. 11-cv-
03350, ECF No. 22 (N.D. Ill. June 8, 2011) (appointing Bursor & Fisher class counsel to
represent a putative nationwide class of consumers who made in-store purchases at Michaels
using a debit or credit card and had their private financial information breached as a result).

Furthermore, "[t]he quality of the opposition should be taken into consideration in
assessing the quality of the plaintiffs' counsel's performance." *In re MetLife Demutalization
Litig.*, 689 F. Supp. 2d 297, 362 (E.D.N.Y. 2010). Class Counsel achieved an exceptional result
in this case while facing well-resourced and experienced defense counsel. *See Marsh ERISA
Litig.*, 265 F.R.D. at 148 ("The high quality of defense counsel opposing Plaintiffs' efforts
further proves the caliber of representation that was necessary to achieve the Settlement.").

Class Counsel litigated this case efficiently, effectively, and civilly. The excellent result
is a function of the high quality of that work, which supports the requested fee award.

### 5.    The Requested Fee In Relation To The Settlement

Class Counsel seeks fees and costs totaling one-third of the $8.225 million settlement
fund. As aforementioned, courts in this Circuit routinely approve fee requests for one-third of a
common fund. *See supra* cases cited in Argument § I. Moreover, the requested fee of one-third
of the settlement fund is less than the 35% approved in two smaller PPPA settlements. *See
Kinder v. Meredith Corp.*, No. 13-cv-11284, ECF No. 81 (E.D. Mich. 2016) (awarding 35% of

14

$7.5 million settlement fund); *Moeller v. American Media, Inc.*, No. 16-cv-11367, ECF No. 42 (E.D. Mich. 2017) (awarding 35% of $7.6 million settlement fund).  This factor thus supports the requested fee award.

### 6. Public Policy Considerations

The final *Goldberger* factor is public policy.  "Skilled counsel must be incentivized to pursue complex and risky claims [that protect the public on a contingency basis]." *Shapiro*, 2014 WL 1224666, at *24.  As such, reasonable fee awards must be provided in order to ensure that attorneys are incentivized to litigate class actions, which serve as private enforcement tools to police defendants who engage in misconduct. *See id.*  "Attorneys who fill the private attorney general role must be adequately compensated for their efforts," otherwise the public risks an absence of a "remedy because attorneys would be unwilling to take on the risk." *Massiah v. MetroPlus Health Plan, Inc.*, 2012 WL 5874655, at *7 (E.D.N.Y. Nov. 20, 2012) (citing *Goldberger*, 209 F.3d at 51).  Further, when individual class members seek a relatively small amount of statutory damages, "economic reality dictates that [their] suit proceed as a class action or not at all." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 161 (1974).

Society undoubtedly has a strong interest in incentivizing lawyers to bring complex litigation that is necessary to protect the privacy of consumers' personal reading choices.  In fact, class action litigation in this area is the most realistic means of safeguarding the privacy of readers under the PPPA, especially because consumers are generally unaware that their privacy rights are being violated by these data sharing practices (here, Plaintiff alleged that TMBI secretly disclosed its customers' personal reading information behind their backs).  Thus, the alternative to a class action in this case would have been no enforcement at all, and TMBI's allegedly unlawful conduct would have continued unabated.  This factor thus supports the requested fee award.

### C.   The Requested Attorneys' Fees Are Also Reasonable Under A Lodestar Cross-Check

A lodestar cross-check further supports the requested fee.  Courts applying the lodestar method generally apply a multiplier to take into account the contingent nature of the fee, the risks of non-payment, the quality of representation, and the results achieved.  *See Wal–Mart Stores, Inc.*, 396 F.3d at 121.  Where the lodestar is "used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court."  *Goldberger*, 209 F.3d at 50; *see also Cassese v. Williams*, 503 F. App'x 55, 59 (2d Cir. 2012) (noting the "need for exact [billing] records [is] not imperative" where the lodestar is used as a "mere cross-check").

To calculate lodestar, counsel's reasonable hours expended on the litigation are multiplied by counsel's reasonable rates.  *See Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565 (1986); *Blum v. Stenson*, 465 U.S. 886, 897 (1984); *Parker v. Time Warner Entertainment Co., L.P.*, 631 F. Supp. 2d 242, 264 (E.D.N.Y. 2009).  The resulting figure may be adjusted at the court's discretion by a multiplier, taking into account various equitable factors.  *See Parker*, 631 F. Supp. 2d at 264; *Shapiro*, 2014 WL 1224666, at *24 ("Additionally, under the lodestar method, a positive multiplier is typically applied to the lodestar in recognition of the risk of litigation, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors.") (internal quotations and citations omitted).

The hourly billing rate to be applied is the hourly rate that is normally charged in the community where the counsel practices, *i.e.*, the "market rate."  *See Blum*, 465 U.S. at 895; *see also Luciano v. Olsten Corp.*, 109 F.3d 111, 115-116 (2d Cir. 1997) ("The 'lodestar' figure should be 'in line with those [rates] prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation'") (alteration in original and citation

omitted).  Here, the hourly rates used by Class Counsel are comparable to rates charged by

attorneys with similar experience, skill, and reputation, for similar services in the New York

legal market.  *See* Marchese Decl. ¶¶ 48-49.[2]

The hours worked, lodestar fee, and expenses for Class Counsel are set forth in the

declaration of Mr. Marchese, submitted herewith.  These records confirm Class Counsel's

efficient billing.  For example, Class Counsel strives to assign as much work as possible to less

senior lawyers who bill at lower hourly rates in order to minimize fees for the Class.

Approximately 70% of attorneys' hours (337.6 hours) were billed by associates.  *Id.* ¶ 43.

However, this was a complex case that involved a lot of novel legal issues, which required

involvement by more experienced lawyers.  Thus, Class Counsel's partners billed approximately

30% of the total attorney hours (146.6 hours), primarily on the pre-suit investigation, developing

the litigation strategy, drafting briefs on dispositive motions, making court appearances,

attending mediations, and negotiating the settlement.  *See id.*

Thus, even under the optional lodestar cross check, Class Counsel's requested fees are

reasonable given the unique circumstances of this case.  Specifically:

- Class Counsel obtained the largest ever total dollar settlement of a PPPA claim, which will result in class members receiving a substantial amount of money quickly.

- The settlement was obtained in an efficient manner, by experienced and qualified counsel.

- The case involved complex and novel legal issues and factual theories.

- Class Counsel devised a litigation and settlement strategy which factored in the

---

[2]  The Supreme Court and other courts have held that the use of current rates is proper since such rates compensate for inflation and the loss of use of funds. *See Missouri v. Jenkins*, 491 U.S. 274, 283-84 (1989) (recognizing "an appropriate adjustment for delay in payment—whether by the application of current rather than historic hourly rates or otherwise"); *LeBlanc-Sternberg v. Fletcher,* 143 F. 3d 748, 764 (2d Cir. 1998) ("The lodestar should be based on 'prevailing market rates' … and current rates, rather than historical rates, should be applied in order to compensate for the delay in payment") (citation omitted).

complex and uncertain nature of the case, and TMBI's available insurance coverage and recent insolvency.

In total, as of December 5, 2017, Class Counsel billed 502.6 hours, which at their hourly rates amounts to a lodestar of $233,681. *See id.* ¶ 44. Therefore, the requested fee award reflects an 11.7 times multiplier on Class Counsel's regular hourly rates. Courts across the country approve multipliers in that range – and even higher – in statutory privacy cases. *See, e.g.*, *Wilkins v. HSBC Bank Nevada, N.A.*, 2015 WL 890566 (N.D. Ill. Feb. 27, 2015) (approving 11.03 lodestar multiplier in a TCPA case); *see also In re Merry-Go-Round Enters., Inc.*, 244 B.R. 327, 335 (Bankr. D.Md. 2000) (approving 19.6 lodestar multiplier). And as courts in this District have noted, a high multiplier "should not result in penalizing plaintiffs' counsel for achieving an early settlement, particularly where, as here, the settlement amount was substantial." *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 482 (S.D.N.Y. 2013); *Hyun*, 2016 WL 1222347, at *3 ("In this case, where the parties were able to settle relatively early and before any depositions occurred … the Court finds that the percentage method, which avoids the lodestar method's potential to 'create a disincentive to early settlement' … is appropriate.") (citing *McDaniel*, 595 F.3d at 418). Moreover, due to TMBI's available insurance coverage and recent insolvency, Class Counsel recognized that an efficient settlement was the best result for the class members, as continued litigation would have only derogated from TMBI's insurance coverage.

Class Counsel's lodestar multiplier is also reasonable because it will increase over time. "[A]s class counsel is likely to expend significant effort in the future implementing the complex procedure agreed upon for collecting and distributing the settlement funds, the multiplier will diminish over time." *Parker v. Jekyll & Hyde Entm't Holdings, LLC*, 2010 WL 532960, at * 2 (S.D.N.Y. Feb. 9, 2010). Here, "[t]he fact that Class Counsel's fee award will not only compensate them for time and effort already expended, but for time that they will be required to spend administering the settlement going forward, also supports their fee request." *Yuzary*, 2013

WL 5492998, at *11 (quoting *McMahon v. Olivier Cheng Catering & Events, LLC*, 2010 WL 2399328, at *8 (S.D.N.Y. Mar. 3, 2010)).

"[C]ourts encourage early settlement of class actions, when warranted, because early settlement allows class members to recover without unnecessary delay and allows the judicial system to focus resources elsewhere." *Beckman*, 293 F.R.D. at 474 (citing *Hernandez v. Merrill Lynch & Co.*, 2012 WL 5862749, at *2 (S.D.N.Y. Nov. 15, 2012); *Castagna v. Madison Square Garden, L.P.*, 2011 WL 2208614, at *6 (S.D.N.Y. June 7, 2011)). Here, the Parties acted responsibly in reaching a relatively early settlement of this case. Class Counsel should be rewarded for achieving the largest total dollar settlement for class members ever in PPPA case relatively quickly.

## II.   THE REQUESTED INCENTIVE AWARD REFLECTS MS. TAYLOR'S ACTIVE INVOLVEMENT IN THIS ACTION AND SHOULD BE APPROVED

Incentive awards are common in class action cases and serve to "compensate plaintiffs for the time and effort expended in assisting the prosecution of the litigation, the risks incurred by becoming and continuing as a litigant, and any other burdens sustained by the plaintiff[s]." *Reyes*, 2011 WL 4599822, at *9. Incentive awards fulfill the important purpose of compensating plaintiffs for the time they spend and the risks they take. *Massiah*, 2012 WL 5874655, at *8.

Here, the participation of Ms. Taylor was critical to the ultimate success of the case. *See* Marchese Decl. ¶¶ 56-58. Ms. Taylor spent approximately 30 hours protecting the interests of the class through her involvement in this case. *See* Declaration of Shannon Taylor ("Taylor Decl.") ¶ 10. Ms. Taylor assisted Class Counsel in investigating her claims, by detailing her magazine subscription histories and aiding in drafting the complaint. *Id.* ¶¶ 3-4. During the course of this litigation, Ms. Taylor kept in regular contact with her lawyers to receive updates on the progress of the case and to discuss strategy. *Id.* ¶ 5. Further, Ms. Taylor preserved and

produced documents in discovery. *Id.* ¶ 6. Finally, Ms. Taylor was actively consulted during the settlement process. *Id.* ¶ 7.

On these facts, the $5,000 incentive payment is fair and reasonable. Indeed, $5,000 is equal to the amounts awarded to the class representatives in *Halaburda v. Bauer*, No. 12-cv-12831, ECF No. 69 and *Moeller v. American Media*, No. 16-cv-11367, ECF No. 42. It is also well within the range of incentive awards approved in this Circuit. *See In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 131 (S.D.N.Y. Oct. 22, 2009) (approving incentive awards of $5,000 each); *Dornberger v. Metro. Life Ins. Co.*, 203 F.R.D. 118, 125 (S.D.N.Y. 2001) (noting case law supports payments of between $2,500 and $85,000). Also, the requested incentive award is approximately 0.06% of the Settlement Fund, which is similar to other cases. *See, e.g.*, *In re Currency*, 263 F.R.D. at 131 (approving incentive award of approximately 0.1% of the settlement fund).

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court (1) approve attorneys' fees in the amount of one-third (33.33%) of the settlement fund, or $2,741,392.50, (2) grant Ms. Taylor an incentive award of $5,000 in recognition of her efforts on behalf of the class, and (3) award such other and further relief as the Court deems reasonable and just.

Dated:  December 5, 2017

Respectfully submitted,


By:    */s/ Joseph I. Marchese*
         Joseph I. Marchese

**BURSOR & FISHER, P.A.**
Scott A. Bursor
Joseph I. Marchese
Philip L. Fraietta
888 Seventh Avenue
New York, NY 10019
Telephone:  (646) 837-7150
Facsimile:  (212) 989-9163
Email:  scott@bursor.com
       jmarchese@bursor.com
       pfraietta@bursor.com

*Class Counsel*